1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PAIUTE-SHOSHONE INDIANS OF THE BISHOP COMMUNITY OF THE BISHOP COLONY, CALIFORNIA, a federally recognized Indian tribe,**<br><br>                    **Plaintiff,**<br><br>          **v.**<br><br>**CITY OF LOS ANGELES, a California municipal corporation,**<br><br>                    **Defendant.** | **1:06-cv-00736 OWW LJO**<br><br>**MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS (DOC. 61)** |

## I.  INTRODUCTION

The Paiute-Shoshone Indians of the Bishop Community of The Bishop Colony, California (the "Tribe" or "Plaintiff") bring this suit in ejectment to reclaim land in the Owens Valley that was transferred in 1941 by agents of the United States (purportedly acting in the name of the Tribe) to the City of Los Angeles.  The Tribe alleges, generally, that the conditions imposed by Congress on this transfer, set forth in a 1937 Act, 50 Stat. 70, were not satisfied, rendering the purported transfer null and void.  The City of Los Angeles moves to dismiss on the ground that the United States is an indispensable party that cannot be joined, Fed. R. Civ. Pro. 19(b), and for failure to state a claim, Fed. R. Civ. Pro. 12(b)(6).  (Doc. 61, filed July 29, 2006.)

**1**

## II.   **FACTUAL BACKGROUND**

The Tribe has resided in what is now known as the Owens Valley from "time immemorial." (Compl. at ¶7.) In the late 1850s, non-Indian settlers took possession of the Tribe's aboriginal lands. (*Id.*) From 1909 to 1924, through purchase and executive order, the United States acquired and set aside five tracts of land, totaling approximately 1,030 acres, for the Tribe (the "Bishop Tribal Lands"). (*Id.* at ¶8.)

In 1937, Congress authorized the Secretary of the Interior to exchange land and water rights in the Owens Valley held by the United States in trust for the Tribe, for land and water rights owned by the City. Act of April 20, 1937, 50 Stat. 70 ("the Act" or "the 1937 Act").

> An Act
>
> To authorize the Secretary of the Interior to exchange certain lands and water rights in Inyo and Mono Counties, California, with the city of Los Angeles and for other purposes.
>
> Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Interior be, and he is hereby authorized, in his discretion to accept title of behalf of the United States to lands and water rights now owned and held by the city of Los Angeles in the counties of Inyo and Mono, State of California, if, in his judgment, the interests of the Indians in said counties will be benefitted thereby; and in consideration therefor the said Secretary may issue a patent or patents to the said city of Los Angeles for lands, water rights, and buildings now held by the United States for the benefit of the Indians, provided that the lands, water rights, and buildings covered by the patent, or patents shall not exceed in value the lands and water rights conveyed by the said city of Los Angeles to the United States: Provided, That the said Secretary may reserve the minerals of the lands conveyed to the said city and the said Secretary is authorized to accept conveyance by the said city of the lands and water rights, subject to a similar reservation in the city of the minerals of such lands,

1
2
3

    and in determining the relative value of the lands and water rights to be exchanged, consideration shall be given to any reservation made by either or both parties of any minerals or easements in the lands that may be exchanged.

4
5
6
7
8
9
10
11

    Sec. 2.  No allotted or other lands covered by trust patent or other instrument containing restriction against alienation by the allottee shall be involved in any such exchange except with the consent of the allottees or their heirs.  Any such allottees or their heirs are hereby authorized to relinquish to the United States any lands covered by such patents or other instruments and accept in lieu thereof assignments of land within the new Indian reservations which are hereby authorized to be established by the Secretary of the Interior, out of any lands accepted by him pursuant to section 1 hereof: Provided, That any such Indian may receive an area of equal value to the area relinquished should any of the lands accepted by the said Secretary be outside of the boundaries of the new reservations.

12
13
14
15

    Sec 3. No tribal lands shall be involved in any such exchange except with the consent of a majority of the adult Indians entitled to the use thereof.  All lands acquired pursuant to the Act, other than land to which title may be held by or in trust for individual Indians, shall be held by the United States in trust for the Indian tribe, band, or group concerned.

16  *Id.*

17      In October 1937, Bureau of Indian Affairs ("BIA") agents

18  conducted a house-to-house canvass, gathering 211 signatures of

19  adult Indians residing in the Owens Valley.  (Compl. at ¶10.)

20  The Tribe alleges that BIA Agents used the house-to-house

21  approach because they wanted to obtain consent "in as quiet and

22  unobtrusive a manner as possible," in order to avoid the

23  "vigorous opposition" that would be expressed in a general

24  meeting of the Indians of the Owens Valley.  (*Id.* at ¶11.)  The

25  Tribe alleges that the house-to-house canvass occurred prior to

26  finalization of the terms of the exchange.  (*Id.* at ¶12.)  Of the

27  211 signatures obtained, 187 were on blank pieces of paper.  (*Id.*

28  at ¶12.)  Plaintiff alleges that the remaining 24 signatures were

1   on pieces of paper bearing a "grossly insufficient description of
2   the exchange to which the signatures were being asked to
3   consent." (*Id.* at ¶13.)  Finally, the Tribe alleges that the BIA
4   ignored the existence of "distinct tribal groups with distinct
5   possessory rights to each of the tracts proposed to be
6   exchanged." (*Id.* at ¶15.)

7        On May 18, 1938, the City and agents of the Department of
8   the Interior executed an agreement (the "Exchange Agreement")
9   providing for the conveyance by the United States to the City of
10  approximately 3,126 acres of federal Indian trust land in the
11  Owens Valley, in exchange for the conveyance by the City to the
12  United States of approximately 1,511 acres in the Owens Valley.
13  Among the tracts to be conveyed to the City by the United States
14  were the Bishop Tribal Lands.  (*Id.* at ¶16.)

15       The Exchange Agreement describes various reasons why the
16  transaction purportedly benefits all parties, including the
17  Tribe.  According to the historical preamble, prior to the
18  exchange, the United States held in trust for the tribe 3,126[1]
19  acres of land that was "rough and rocky and of poor soil
20  fertility." (Exchange Agreement at ¶21, Ex. 5 to Plaintiff's
21  Request for Judicial Notice ("PRJN"), Doc. 63.)  Along with this
22  acreage, the United States held in trust for the Tribe a right to
23  receive a total of 2279.35 acre feet of water per year, by virtue
24  of the United States' ownership of stock in the Owens River Canal
25  Company and other canal companies.  (*Id.* at ¶¶ 5, 6, 16.)  The

26  ─────────────────

27       [1]   Among the 3,126 acres of Indian trust land to be
    conveyed to the City, the approximately 1,030 acres of Bishop
28  Tribal Lands are the subject of this lawsuit.

**4**

Exchange Agreement also memorializes the City's belief that to continue to deliver this 2279.35 acre feet of water to the initial 3126 acres of land via the existing system of ditches and canals would result in relatively large transportation losses. The City estimated that approximately 8454 acre feet of water per year was lost as a result of seepage, evaporation, and losses resulting from the "necessarily decreased volume and velocity of the water carried." (*Id.* at ¶¶ 13-16.) The City recognized that approximately 3766.57 acre feet of this 8454 acre feet per year transportation loss was "chargeable to the water right belonging to the United States." (*Id.* at ¶16.) The parties agreed that it would be mutually advantageous to avoid these transportation losses and to share the salvaged water:

> It is considered to the mutual advantage of the City and the United States that said transportation losses be avoided and that the waters heretofore lost be salvaged and conserved and that each of the parties hereto shall receive its proportional share of such waters so salvaged and conserved....

(*Id.* at ¶17.) In order to accomplish this, the City agreed to transfer 1511.48 acre feet of higher quality land to the United States, to be used by the Tribe. The Exchange Agreement states that the new lands "are much more valuable for agricultural purposes by reason of the topography and soil fertility" than the old parcels. In sum, the parties agreed that the new lands, irrigated with the water right appurtenant to the old lands (including the United States share of the salvaged water, amounting to 3766.57 acre feet of water), would be more productive than the status quo ante:

**5**

>Whereas, both parties hereto, after careful study, consider the said 1511.48 acres of land are of value equal to the value of the said 3126 acres of land, and it is further considered that it would be very much to the advantage of the Indians to have the exchange of the aforesaid lands consummated by reason of the fact that the water appurtenant to the said 3126 acres of land if delivered to said 1511.48 acres of land will make it possible to irrigate more acres of land and produce more crops than has been possible in the past by delivering the amount of water available under said water right to the Indian lands to which it is now appurtenant, and that said advantage and economy in the use of water can be brought about by reason of the fact that transportation losses can be eliminated if the water be delivered to the aforesaid 1511.48 acres instead of the said Indian lands to which it is now appurtenant.

>Whereas, if said exchange of lands be made and the water rights appurtenant to the Indian lands transferred to the said 1511.48 acres of land to be conveyed to the United States by the City, pursuant hereto, there will not only be a saving as aforesaid to the United States and to the said Indians of about 3766.57 acre feet of water per annum but an actual saving to the City of about 4687.43 acre feet of water per annum;

(*Id.* at ¶¶ 22-23.)

Among other things, the Exchange Agreement provided for a reservation by each party of all water rights appurtenant to the exchanged land. (Compl. at ¶18.) The Tribe alleges that this was done to "avoid delay and the risk of rejection of the Exchange Agreement by the City's voters, whose approval was required by the City's charter for the sale or exchange of any water rights owned by the city." (*Id.*) Article XXII, Section 219 of the Charter of the City of Los Angeles provides:

>The City shall not sell, lease or otherwise dispose of its rights in the waters of said Los Angeles River, in whole or in part. No other water or water right, now or hereafter owned or controlled by the City, shall ever be sold, leased or disposed of, in whole or in part without the assent of two-thirds of the qualified voters of the City voting on the proposition at a general or special election, at which such proposition

**6**

1
2
3
                      shall be lawfully submitted, and no water shall ever be
sold, supplied, or distributed to any person or
corporation other than municipal for resale, rental or
disposal to consumers or other persons.

4  (emphasis added).

5      The Tribe alleges that "[t]he appraisals of the lands
6  exchanged by the City and the United States upon which the
7  Exchange agreement was based did not include the value of
8  appurtenant water rights, making it impossible to determine, as
9  required by the Act, that the properties conveyed to the City by
10 the United States did not exceed in value the properties received
11 by the City."  (Compl. at ¶19.)

12     The Tribe also alleges that neither the Tribe nor its
13 members were asked to approve the final terms of the Agreement.
14 (*Id*. at ¶17.)  In July 1941, the United States executed a deed
15 purporting to convey to the City the tracts of lands that were
16 the subject of the Exchange Agreement, including the Bishop
17 Tribal lands, without water rights. (Ex. 5 to Defendant's
18 Request for Judicial Notice, Docs. 55-58.)

19     The Tribe maintains  that "[b]ecause the conditions mandated
20 by Congress in the Act for conveyance of the Bishop Tribal Lands
21 were not satisfied, the purported transfer of those lands by the
22 United States to the City was null and void."  (Compl. at ¶23.)

23     The Tribe also asserts that some aspects of the legislative
24 history from the 1937 Act shed light on the legality of the
25 Exchange Agreement and its implementation.  First, both the
26 Senate and House Reports associated with the bill consist in
27 their entirety of a letter from the Secretary of the Interior to
28 the Speaker of the House of Representatives, stating:

**7**

The city of Los Angeles has, over a period of years, acquired practically all of the lands in the Owens Valley in order to protect the watershed of the city's water supply. On account of such purchases, practically all private industry has been removed from the valley, thus leaving most of the Indians located there without adequate lands or any source of income. For this reason, representatives of the Department [of the Interior] and the authorities of the City of Los Angeles have been endeavoring for a number of years to make some arrangements to provide lands of a desirable character for these Indians.

The Government owns various tracts in the valley that have been acquired for Indian purposes at various tracts. Although these lands are being used to a limited extent by the Indians, most of them are not suitable for Indian colonization. On the other hand, the city now owns the best lands in the valley, including water rights, among which are certain tracts that are extremely desirable for Indian use. With a view to meeting this long standing Indian problem, the city authorities have expressed their willingness to exchange some of their lands that we believe ideal for Indian home sites for the present Government-owned tracts in the valley. The present tentative plans for exchange would involve our trading approximately 3,800 acres, which have been appraised at $73,489, for 1,470 acres belonging to the city, all of which city land carries with it water rights, as determined by our irrigation engineers, sufficient to meet all water requirements for agricultural and domestic purposes. Because of the desirable water rights attached to the lands, the tracts offered by the city are recognized as being fully as valuable as the present Indian lands. In fact, from an Indian-use standpoint, their value is considerably higher. However, we wish to point out here that the proposed draft of bill would authorize an exchange only in the discretion of the Secretary of the Interior, and that the consent of a majority of the Indians involved also would have to be obtained. Therefore, no exchange would be consummated unless it were clearly apparent that the Government would receive full value for any land conveyed to the city of Los Angeles, and the Indians themselves approved the transaction.

It appears from recent investigations that there are approximately 181 Indian families, comprising of 524 individuals, located in the Owens Valley. The attitude of these Indians toward the proposed exchange is favorable. The question of removal of the Indians from the valley to some other point has been given consideration, but due to their strenuous objections and the difficulty in locating lands that will meet

**8**

1
2
3

their needs in localities offering opportunities for
employment and other homes in the valley for these
Indians where they can be rehabilitated and become more
or less self-supporting.

4
5
6

The bill permits the reservation of minerals underlying
the lands involved to the United States and the city of
Los Angeles, respectively.

7
8

There are enclosed copies of reports and maps showing a
graphic picture of the Owens Valley problems and the
lands involved in the proposed exchange.
In view of the foregoing, I recommend that the enclosed
draft of bill be given favorable consideration.

9

***

10
11

Charles West,
Acting Secretary of the Interior.

12
13
14

S.R. 278, Inyo and Mono Counties, Calif. – Exchange of Lands,

75th Cong., 1st Sess.; H.R. 365, 75th Cong., 1st Sess.  (PRJN

Exs. 1-2, Doc. 63.)

15
16
17
18
19

Next, the tribe cites a Letter from Frederic L. Kirgis,

Acting Solicitor, to the Secretary of the Interior, which

addresses the question of whether the lands may be alienated

without water rights.

20

My dear Mr. Secretary:

21
22
23
24

You have presented for my consideration and opinion
several questions raised by the Office of Indian
Affairs in connection with the proposed land and water
rights exchanges between the Government and the City of
Los Angeles, California, authorized to be made by the
act of April 20, 1937, Public No. 43, 75th Congress.
These questions are substantially as follows:

25
26
27
28

1.    Under the act may lands alone be exchanged?  If
so, in lieu of exchanging water rights as
authorized by the act, can the Government and the
city contract with respect to the water rights,
providing thereby that the city shall furnish
water to the Indians concerns and that the United
States shall, for the benefit of the city, forbear
to use the water rights retained by it?

**9**

\*\*\*

In answer to the first question, it is my opinion that the act permits the exchange of lands alone.... The authority is to accept title to "lands <u>and</u> water rights" and in exchange therefor to patent "lands, water rights, <u>and</u> buildings."  But the word "and" as used here is often construed in the coordinate sense. *Hensel, Bruckman & Lorbacher v. United States*, 126 Fed. 576; *Robson v. Cantwell* et al. 141 S.E. 180 (S.C.). The present case is one where such a construction appears proper for there is no indication that Congress intended to permit exchanges only of lands together with water rights.  The only limitation on the broad discretionary authority given to the Secretary to effect exchanges is that there shall be an equivalence of values.  This, of course, can be accomplished without construing the act as requiring an exchange of both lands and water rights.  There is immediately suggested a question of the validity of the severance of water rights from lands.  That this can be accomplished by conveyance under the water law of California seems to be true, but this question need not be determined now.  It is rather a question of the sufficiency of title to be considered whenever in a particular exchange such a severance is contemplated.

It is my opinion, in answer to the second question under part I of this opinion, that there is no authority in the Secretary to contract with the City of Los Angeles for the use and delivery of water.

The act authorizes the Secretary "to accept title ...to...water rights" and in consideration therefor to issue "a patent or patents...for lands, water rights, and buildings."  There is no other authority in the act to deal with water rights.  In the absence of such other authority, whether the proposed agreement is authorized by the act turns, therefore, on whether by the proposed agreement title to the water rights will pass to the Government. Obviously, an agreement by the city to furnish water contemplates the retention of title by city and the absence of title thereto in the United Sates.  This is not contemplated by the act.

The suggestion of the contract in lieu of a transfer of title is made because a conveyance of water rights by the city can be made only after securing the approval of two-thirds of the city voters at an election.  This procedure, it is believed, will unduly delay consummation of the exchanges.  But the desired result of immediate use of the water rights can be accomplished despite this.  Thus, a contract can be entered into relating to the use of the water rights pending the conveyance thereof, the contract to provide

**10**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> that a conveyance shall be made in the manner authorized by law within some agreed time, and that the contract shall terminate on the failure to so convey. Such a contract can be made, in my option, for it is properly but an integral step in the transfer of title within the purview of the act.

(PRJN Ex 3, Doc. 63 (emphasis added).)   The Tribe seeks ejectment of the City from the Bishop Tribal Lands.   (Compl. at 6.)

The tribe does not request rescission of the exchange agreement, nor do they offer to relinquish their title in the lands previously owned by the City.  Rather, the complaint, on its face, seeks only ejectment of the City from the Bishop Tribal lands.

### III.   <u>STANDARD OF REVIEW</u>

A complaint may be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) if it "appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Simpson v. AOL Time Warner Inc.,* 452 F.3d 1040, 1046 (9th Cir. 2006).  Alternatively, dismissal can be based on the lack of a cognizable legal theory. *SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F3d 780, 783 (9th Cir. 1996).  In evaluating such a motion "[a]ll allegations and reasonable inferences are taken as true, and the allegations are construed in the light most favorable to the non-moving party, but conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Simpson,* 452 F.3d at 1046.

//

//

//

11

1

**IV.   DISCUSSION**

2

**A.   Requests for Judicial Notice**.

3

**1.   Defendant's Requests.**

4      The City requests that the court take judicial notice of the
5  following.

6              (1)   The complaint in this case.

7              (2)   A copy of the 1938 Agreement between the United
                     States and the City of Los Angeles, referenced in
8                    the Complaint.

9              (3)   A copy of Section 219 of the Charter of the City
                     of Los Angeles, adopted 1925, and referenced in
10                   Paragraph 18 of the Complaint.

11             (4)   A copy of the April 20, 1937 Act of Congress, 50
                     Stat. 114.
12
               (5)   A copy of the 1941 patent from the United States
13                   to the City of Los Angeles, conveying certain Inyo
                     County, California lands reference in the
14                   complaint.

15      It is not necessary to take judicial notice of the Complaint
16  or of the April 20, 1037 Act of Congress.  Both may be referenced
17  by the parties as a matter of course.

18      The remaining documents are judicially noticeable public
19  records.  *See* Fed. R. Evid. 201.  Moreover, the 1938 agreement
20  between the United States and the City and the 1941 patent from
21  the United States to the City are otherwise admissible on a
22  motion to dismiss under the "incorporation by reference
23  doctrine," whereby a district court may consider documents "whose
24  contents are alleged in a complaint and whose authenticity no
25  party questions, but which are not physically attached to the
26  [plaintiff's] pleading."  *Knievel v. ESPN*, 393 F.3d 1068, 1076
27  (9th Cir. 2005).

28

**12**

**2.   Plaintiff's Requests.**

The Tribe requests that judicial notice be taken of

(1)   Senate Report No. 278 regarding the 1937 Act.

(2)   House Report No. 365 regarding the 1937 Act.

(3)   Two copies of a 1937 Solicitors opinion to the Secretary of the Interior, one obtained from the National Archives and the second from a compilation of Department of the Interior's Solicitor's Opinions.

(4)   A copy of a September 23, 1937 letter from the Bureau of Indian Affairs Agency Superintendent to Commissioner John Collier obtained from federal records at the Pacific National Archives in San Bruno, California.

(5)   A complete copy of the 1938 Agreement between the United States and the City of Los Angeles from the National Archives.

All of these documents are public records the accuracy of which cannot be reasonably questioned.  Accordingly, they are judicially noticeable.  *See* Fed. R. Evid. 201.  Moreover, as discussed, the Exchange Agreement is admissible under the incorporation by reference doctrine.


**B.   Legal Background.**

The starting point for analysis of the claims in this case is the Nonintercourse Act, 25 U.S.C. § 177, which prohibits alienation of any land from any Indian tribe without the consent of the United States Congress:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, <u>unless the same be made by treaty or convention entered into pursuant to the Constitution</u>. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe

1
2
3
4
5
6

> of Indians for the title or purchase of any lands by
> them held or claimed, is liable to a penalty of $1,000.
> The agent of any State who may be present at any treaty
> held with Indians under the authority of the United
> States, in the presence and with the approbation of the
> commissioner of the United States appointed to hold the
> same, may, however, propose to, and adjust with, the
> Indians the compensation to be made for their claim to
> lands within such State, which shall be extinguished by
> treaty.

(emphasis added).  The United States Supreme Court held in *Oneida*

7
8

*County, New York v. Oneida Indian Nation of New York*, 470 U.S.

9

226 (1985)(*Oneida II*), that the Nonintercourse act "merely

10

codified the principle that a sovereign act was required to

11

extinguish aboriginal title and thus that a conveyance without

12

the sovereign's consent was void ab initio." *Id.* at 246.

13

   In *Oneida II*, the Onedia Indian Nation brought a claim for

14

damages against two counties in upstate New York, seeking

15

compensation for the fair rental value of land presently owned

16

and occupied by the counties.  The Oneida alleged that their

17

ancestors once possessed the disputed lands as tribal holdings,

18

but conveyed the lands to New York State under a 1795 agreement

19

that violated the Nonintercourse Act of 1793.  The Supreme Court

20

held that Indian tribes have a federal common-law right to

21

"vindicate their aboriginal rights" by way of a suit to enforce

22

their aboriginal land rights.  470 U.S. at 236.  The right to

23

bring such an action is not pre-empted by the Nonintercourse Act

24

itself, nor is such a suit barred by the state statute of

25

limitations, as this would run contrary to legislative intent of

26

the Nonintercourse Act.  *Id.* at 237-44.  The *Oneida II* court

27

declined, however, to rule on the application of the defense of

28

laches to such a claim, because the trial court ruled against the

**14**

1   defendant counties on that issue and the counties did not

2   reassert the defense on appeal. *Id*. at 244-45. Finally, *Oneida*

3   *II* reiterated the well established cannon of construction

4   applicable in Indian law that "treaties should be construed

5   liberally in favor of the Indians." *Id*. at 147 (citing *Choctaw*

6   *Nation v. United States*, 318 U.S. 423 (1985)); *see also Montana*

7   *v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (applying

8   the same canon to statutes).

9                **1.   State Law Versus Federal Common Law.**

10      The Tribe seeks to eject the City from the lands transferred

11  to the City by the United States pursuant to the Exchange

12  Agreement.  The Tribe cites California law for the proposition

13  that "[t]he elements of an action for ejectment are possession of

14  land by another and evidence of plaintiff's title or other right

15  to the land at issue." (Doc. 62 at 3.)  But, under *Oneida II*,

16  the claim the Tribe seeks to bring arose under <u>federal common</u>

17  <u>law</u>, not state law.  *Oneida II* found that the Oneida Nation could

18  bring a federal common law right of action to enforce the terms

19  of the Nonintercourse Act, notwithstanding the state statute of

20  limitations which conflicted with the Congressional purpose of

21  the Act.

22      Here, whether this claim is premised upon the 1937 Act or

23  the Nonintercourse Act or a combination of both, the source of

24  the Tribe's ejectment claim is <u>federal</u> not state law. (It is for

25  this reason alone that the state statute of limitations does not

26  bar this action.)  Accordingly, the appropriate source for the

27  elements of ejectment is federal common law.  The Second Circuit

28  held that a federal complaint in ejectment should allege that the

**15**

1  plaintiff is the owner of the land and that the defendant
2  wrongfully ousted the plaintiff from possession." *New York v.*
3  *The County of Oneida*, 719 F.2d 525 (2d Cir. 1983), modified on
4  other grounds and aff'd, 470 U.S. 226 (1985).

5              **2.    Equitable Versus Legal and the *Sherrill* case.**

6       The City argues that the Tribe's demand for ejectment is an
7  equitable claim.  Accordingly, the City advances the "common
8  maxim of jurisprudence that he who seeks equity must do equity,"
9  *Manufacturers Finance Co. v. McKey*, 294 U.S. 442 (1935), arguing
10  that the Tribe's claim should be barred because the Tribe
11  "continues to occupy the reservation land created from the City's
12  land" and has expressed no intention of returning that land to
13  the possession of the City.

14       The Tribe rejoins that ejectment is a <u>legal</u>, not an
15  equitable, remedy, so their claim is not subject to the equitable
16  defenses such as the clean hands doctrine.

17       Although the Tribe is technically correct that ejectment is
18  a legal claim, <u>the distinction between law and equity has been</u>
19  <u>blurred significantly in the context of Indian claims for</u>
20  <u>ejectment</u>.  *See Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d
21  266, 275 n.5 (2d Cir. 2005)(noting that although ejectment "has
22  traditionally been considered an action at law, numerous
23  jurisdictions have recognized the applicability of equitable
24  defenses, including laches, in an action for ejectment based on a
25  claim of legal title or prior possession, regardless of whether
26  damages or an order of possession was sought").  Although the
27  Supreme court declined to decide whether laches could bar a claim
28  for damages in *Oneida II*, the Court did take up the issue in

**16**

1   *Sherrill*, *New York v. Oneida Indian Nation of New York*, 544 U.S.

2   197 (2005).   There, the Court applied the equitable principles of

3   laches, acquiescence, and impossibility to the Oneida's claim

4   that its open-market purchases of specific parcels of land once

5   contained within the boundaries of the tribe's former reservation

6   reinstated aboriginal title so that the tribe could assert

7   sovereignty over the purchased lands and avoid paying city

8   property taxes.   *Id.* at 213-221.

9        In *Sherrill*, New York State had governed the disputed lands

10  continuously for more than two hundred years.   The Supreme Court

11  reasoned that:

12           The appropriateness of the relief [the Oneida Indian
             Nation] here seeks must be evaluated in light of the
13           long history of state sovereign control over the
             territory. From the early 1800's into the 1970's, the
14           United States largely accepted, or was indifferent to,
             New York's governance of the land in question and the
15           validity vel non of the Oneidas' sales to the State.
             In fact, the United States' policy and practice through
16           much of the early 19th century was designed to dislodge
             east coast lands from Indian possession.  Moreover, the
17           properties here involved have greatly increased in
             value since the Oneidas sold them 200 years ago.
18           Notably, it was not until lately that the Oneidas
             sought to regain ancient sovereignty over land
19           converted from wilderness to become part of cities like
             Sherrill.
20
    *Id*. at 214 (citations omitted).
21
22       Citing numerous examples, *Sherrill* recognized the

23  applicability of the doctrine of laches, finding that "[t]he

24  principle that the passage of time can preclude relief has deep

25  roots in our law, and this Court has recognized this prescription

26  in various guises."   *Id*. at 217.

27           It is well established that laches, a doctrine focused
             on one side's inaction and the other's legitimate
28           reliance, may bar long-dormant claims for equitable
             relief....This Court applied the doctrine of laches in

                                   **17**

> *Felix v. Patrick*, 145 U.S. 317 (1892), to bar the heirs
> of an Indian from establishing a constructive trust
> over land their Indian ancestor had conveyed in
> violation of a statutory restriction. In the nearly
> three decades between the conveyance and the lawsuit,
> "[a] large part of the tract ha[d] been platted and
> recorded as an addition to the city of Omaha, and...
> sold to purchasers." *Id.*, at 326.  "[A]s the case
> stands at present," the Court observed, "justice
> requires only what the law ··· would demand-the
> repayment of the value of the [illegally conveyed]
> scrip." *Id.*, at 334.  The Court also recognized the
> disproportion between the value of the scrip issued to
> the Indian ($150) and the value of the property the
> heirs sought to acquire (over $1 million). *Id.*, at 333.
> The sort of changes to the value and character of the
> land noted by the *Felix* Court are present in even
> greater magnitude in this suit....

*Id.* at 217-18 (select internal citations and parallel citations

omitted).

   *Sherrill* also applied the doctrine of impracticability.

> [T]his Court has recognized the impracticability of
> returning to Indian control land that generations
> earlier passed into numerous private hands. *See Yankton
> Sioux Tribe v. United States*, 272 U.S. 351, 357 (1926)
> ("It is impossible...to rescind the cession and restore
> the Indians to their former rights because the lands
> have been opened to settlement and large portions of
> them are now in the possession of innumerable innocent
> purchasers....")...The District Court, in the
> litigation dormant during the pendency of *Oneida II*,
> rightly found these pragmatic concerns about restoring
> Indian sovereign control over land "magnified
> exponentially here, where development of every type
> imaginable has been ongoing for more than two
> centuries."  *Oneida Indian Nation of N. Y.*, 199 F.R.D.,
> at 92.

*Id.* at 219 (internal citations omitted).

   The *Sherrill* court then applied the impossibility doctrine

to the facts presented, rejecting the Second Circuit's conclusion

that impossibility had no application because the Oneida acquired

the land in the open market and did not seek to uproot any

property owners.  Rather, the *Sherrill* Court found that "the

unilateral reestablishment of present and future Indian sovereign

**18**

control, even over land purchased at the market price, would have

disruptive practical consequences similar to those that led this

Court in *Yankton Sioux [v. United States*, 272 U.S. 351, 357

(1926)] to initiate the impossibility doctrine."  *Id.* at 219.

> The city of Sherrill and Oneida County are today
> overwhelmingly populated by non-Indians. A checkerboard
> of alternating state and tribal jurisdiction in New
> York State-created unilaterally at OIN's behest-would
> seriously burden the administration of state and local
> governments and would adversely affect landowners
> neighboring the tribal patches. If OIN may unilaterally
> reassert sovereign control and remove these parcels
> from the local tax rolls, little would prevent the
> Tribe from initiating a new generation of litigation to
> free the parcels from local zoning or other regulatory
> controls that protect all landowners in the area.

*Id.* at 219-220.  *Sherrill* further noted that Congress provided a

mechanism for tribal communities to acquire lands that

"[r]ecogniz[es] these practical concerns," by "tak[ing] account

of the interests of others with stakes in the area's governance

and well being."

> Title 25 U.S.C. § 465 authorizes the Secretary of the
> Interior to acquire land in trust for Indians and
> provides that the land "shall be exempt from State and
> local taxation."  The regulations implementing § 465
> are sensitive to the complex interjurisdictional
> concerns that arise when a tribe seeks to regain
> sovereign control over territory. Before approving an
> acquisition, the Secretary must consider, among other
> things, the tribe's need for additional land; "[t]he
> purposes for which the land will be used"; "the impact
> on the State and its political subdivisions resulting
> from the removal of the land from the tax rolls"; and
> "[j]urisdictional problems and potential conflicts of
> land use which may arise." 25 CFR § 151.10 (2004).
> Section 465 provides the proper avenue for OIN to
> reestablish sovereign authority over territory last
> held by the Oneidas 200 years ago.

*Id.* at 220-21.[2]

---

[2]    *Sherrill* specifically held that because "the question
of damages for the Tribe's ancient dispossession is not at issue

### 3. The City's Laches Argument and The Tribe's Motion to Strike.

The City argues for the first time in its reply brief that "the Tribe's sixty-five years of inaction on its claim of sovereignty and the [C]ity's reliance on the exchange agreement with the United States bars this action." (Doc. 64 at 3.) Citing *Sherrill*, the City maintains:

> [T]he Tribe here has waited more than 65 years before challenging the City's right to occupy the land it acquired by exchange in 1941, much to the detriment of Los Angeles. The former reservation lands patented to Los Angeles 65 years ago have been under the control of the State of California, the County of Inyo and the City since that time.

(*Id.*)

The Tribe moves to strike "Defendant's untimely argument," arguing that the City in its reply brief "raises for the first time the claim that the equitable defense of laches requires dismissal of the complaint in this action under Fed. R. Civ. P. 12(b)(6)." (Doc. 67.)[3] The City filed an opposition to the motion to strike. (Doc. 68.)

The Tribe is correct that this argument was not raised in the City's opening brief. (Doc. 61) The tribe requests either that the argument be ignored or that they be afforded an opportunity to respond. Under certain circumstances, one of

---

in this case, and we therefore do not disturb our holding in *Oneida II*." 544 U.S. at 221. Here, however, the remedy sought is ejectment, not damages, so *Sherrill* controls.

[3] The motion to strike was originally set for separate hearing, but because it is closely related to the instant motion to dismiss, the court ordered that both motions be heard together on the original hearing date set for the motion to dismiss. (Doc. 68.)

those two approaches might be appropriate.  Here, however,

because the issue of laches raises significant questions of fact

that cannot be resolved on a motion to dismiss, it is most

efficient to deny they City's motion to dismiss on the ground of

laches, without prejudice to its renewal.  *See e.g., New York v.*

*Shinnecock Indian Nation*, 400 F. Supp. 2d 486, 496 (E.D.N.Y.

2005)(recognizing that the question of whether a particular set

of facts presents a "disruptive" claim barred by *Sherrill*

involves "factual and legal determinations which may only be

resolved at a trial").[4]


### C.    Is the United States an Indispensible Party?

The City argues that the United States must be found an

indispensable party to this lawsuit pursuant to Federal Rule of

Civil Procedure 19(b).  Assuming this to be the case, the City

maintains that any such claim for ejectment brought against the

United States by the Tribe is barred by the statute of

limitations set forth in the Indian Claims Commission Act, 12

Stat. 765.  Finally, the City argues that because the United

States is an indispensable party and no claim can be maintained

against the United States, the entire case must be dismissed

pursuant to Federal Rule of Civil Procedure 19(b).

---

[4]    The only twentieth or twenty-first century case cited
by the City in support of its Laches argument, *Sherrill*, 544 U.S.
at 226, was decided on summary judgment.

**21**

1.  ***Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455 (10th Cir. 1987).**

The City relies principally on *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455 (10th Cir. 1987), in support of dismissal.  In that case, the Navajo asserted that the United States improperly transferred tribal lands to the State of New Mexico and several individuals.  The United States, New Mexico, and the individual grantees were named as defendants.  The Tenth Circuit found that the Navajo's claim against the United States was barred because it fell within the exclusive jurisdiction of the Indian Claims Commission ("ICC") and was barred by the applicable statute of limitations contained within the Indian Claims Commission Act ("ICCA").

*Navajo Tribe* succinctly summarizes the history of the ICCA[5] and its general operation:

> Until 1946, Indian tribes could not litigate claims against the United States unless they obtained specific permission from Congress. Although the Court of Claims was created nearly a century before to hear claims against the United States, Congress excluded from the court's jurisdiction Indian claims based on treaties. Act of March 3, 1863, ch. 92, § 9, 12 Stat. 765, 767. Sovereign immunity barred litigation of non-treaty claims. Year after year, tribes petitioned Congress for special jurisdictional acts authorizing the Court of Claims to hear their grievances against the United States; yet few of them succeeded. For those who did succeed, the process was costly, burdensome, and time-consuming.
>
> In 1928, this piecemeal scheme of resolving Indian claims against the Government was severely criticized in the Meriam Report, an independent study conducted by the Institute for Government Research.FN10 The Meriam

---

[5]  Act of Aug. 13, 1946, ch. 959, 60 Stat. 1049 (formerly codified as amended at 25 U.S.C. §§ 70 to 70v-2 (1976), but omitted from current Code because the Indian Claims Commission terminated on September 30, 1978).

22

Report recommended the establishment of an independent, fact-finding commission to facilitate the judicial solution of outstanding Indian claims against the United States. After studying various proposals, Congress finally enacted the Indian Claims Commission Act in 1946, creating a quasi-judicial body to hear and determine all tribal claims against the United States that accrued before August 13, 1946.

The ICCA confined the Commission's jurisdiction to tribal claims that accrued before its 1946 enactment, while it conferred jurisdiction on the Court of Claims to adjudicate any tribal claim accruing after 1946 that would be cognizable in the Court of Claims if the claimant were not an Indian tribe. ICCA § 24, 28 U.S.C. § 1505 (1982).

Congress also limited the period for filing tribal claims with the Indian Claims Commission to five years. Any claim that accrued before August 13, 1946, and which was not filed with the Commission by August 13, 1951, could not "thereafter be submitted to any court or administrative agency for consideration," nor could such a claim "thereafter be entertained by the Congress." ICCA § 12, 25 U.S.C. § 70k (1976).

Although the ICCA provided that the Commission would terminate at the end of ten years, Congress extended its life several times because of its enormous caseload. The Commission was finally dissolved in 1978, at which time its remaining cases were transferred to the Court of Claims.

809 F.2d at 1460 (citations omitted).

The Tenth Circuit concluded that, because the Navajo knew or should have known of the basis for its claim against the United States prior to the expiration of the 1951 ICCA filing deadline, the claim was barred.  The court also found that the United States was an indispensable party to the case and that the claims against the remaining defendants could not proceed without the federal government.  *Id.* at 1471-72 (internal quotations and citations omitted).

Finally, the *Navajo Tribe* Court reasoned that monetary compensation was the exclusive remedy available under the ICCA.

**23**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> The Tribe, even if it had timely filed its claim under the ICCA, could not have quieted title in these lands or maintained an action in ejectment... The Tribe simply would have had to accept just monetary compensation if the Commission found their claim to title valid. This restriction as to remedy represents a fundamental policy choice made by Congress out of the sheer, pragmatic necessity that, although any and all accrued claims could be heard before the Commission, land title in 1946 could not be disturbed because of the sorry injustices suffered by native Americans in the eighteenth, nineteenth, and early twentieth centuries. Those injustices would have to be recompensed through monetary awards. As one commentator notes:
>
>> The Indian Claims Commission Act also addressed a major collateral concern of the Congress. Prior to the Act, non-Indians who held title derived from federal patents to land claimed by Indians could not be secure in their ownership until the Indians' claims were litigated. By authorizing the Indian Claims Commission-the only forum in which Indian claims against the United States for land they once possessed could be heard-to grant only monetary damages in satisfaction of Indian claims, non-Indians were assured of continued possession regardless of the outcome of the litigation. <u>Relief in the form of a declaratory judgment or injunction would have resulted in the radical remedy of dispossessing the dispossessors. By restricting the remedy, the Act forced the Indian to accept a post factum sale</u>.

*Id.* at 1467 (emphasis in original).

Therefore, where the United States is an indispensable party to a case, a plaintiff may not avoid the exclusive remedy of the ICCA (damages) by seeking title or possession from third parties. The *Navajo Tribe* court adopted the district court's reasoning:

> [A] tribe may not avoid the exclusivity bar [] of the Indian Claims Commission Act by seeking title, possession and damages from successors in interest of the United States, where suit against the federal government is barred...

*Id.* at 1472.

1  The City maintains that Navajo Tribe controls the outcome of

2  this case.  In opposition, the Tribe points to a number of cases

3  from the Ninth Circuit and elsewhere which reach different

4  conclusions regarding the indispensability of the United States

5  in tribal property rights cases.

6  **2.   Analysis of the Indispensable Party Issue.**

7  The joinder of indispensable parties is governed by Federal

8  Rule of Civil Procedure 19, which provides:

9  (a)   Persons to be Joined if Feasible. A person who is
10  subject to service of process and whose joinder
   will not deprive the court of jurisdiction over
11  the subject matter of the action shall be joined
   as a party in the action if (1) in the person's
12  absence complete relief cannot be accorded among
   those already parties, or (2) the person claims an
13  interest relating to the subject of the action and
   is so situated that the disposition of the action
14  in the person's absence may (i) as a practical
   matter impair or impede the person's ability to
15  protect that interest or (ii) leave any of the
   persons already parties subject to a substantial
16  risk of incurring double, multiple, or otherwise
   inconsistent obligations by reason of the claimed
17  interest....

18  (b)   Determination by Court Whenever Joinder not
   Feasible. If a person as described in subdivision
19  (a)(1)-(2) hereof cannot be made a party, the
   court shall determine whether in equity and good
20  conscience the action should proceed among the
   parties before it, or should be dismissed, the
21  absent person being thus regarded as
   indispensable.  The factors to be considered by
22  the court include:  first, to what extent a
   judgment rendered in the person's absence might be
23  prejudicial to him or those already parties;
   second, the extent to which, by protective
24  provisions in the judgment, by the shaping of
   relief, or other measures, the prejudice can be
25  lessened or avoided;  third, whether a judgment
   rendered in the person's absence will be adequate;
26  fourth, whether the plaintiff will have an
   adequate remedy if the action is dismissed for
27  nonjoinder.

28

25

**a.   Is the United States a Necessary Party?**

The first step is to determine whether the United States is necessary to the litigation under Rule 19(a).  The Ninth Circuit applies a two-pronged analysis to determine whether a non-party is necessary.  *Yellowstone County v. Pease,* 96 F.3d 1169, 1172 (9th Cir. 1996).  "If a non-party satisfies either of the two prongs, the non-party is necessary."  *Id.*  First, a court must determine whether "'complete relief' is possible among those already parties to the suit."  *Id.*  Alternatively, a party is necessary if a court determines that the non-party has a "legally protected interest in the suit."  *Id.*  "The inquiry under Rule 19 is a practical one and fact specific... [and] must be made in light of the particular circumstances of each case."  *Blumberg v. Gates*, 204 F.R.D. 453, 454 (C.D. Cal. 2001).

In *Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251, 1254 (9th Cir. 1983), a suit brought by an Indian tribe to quiet title to a portion of a riverbed exposed by a dredging and rechannelization project, the United States was a "necessary" party because, as trustee, it held legal title to the real property in dispute.  The Ninth Circuit reasoned that unless the United States was formally joined as a party, it would "not be bound by any decree ensuing from this litigation....Absent joinder of the United States, a judgment entered in this case in favor of the [defendant] will not necessarily render complete relief to the [defendant] or protect the [defendant] from

**26**

1  inconsistent judgments." *Id*. at 1254-55.[6]  *Accord Fort Mojave*
2  *Tribe v. Lafollette*, 478 F.2d 1016 (9th Cir. 1973).

3      Here, the parties did not directly brief the question of
4  whether the United States should be deemed a "necessary" party
5  for purposes of Rule 19(a).  As in *Puyallup*, lands in dispute in
6  this case (specifically, the lands now held by the Tribe which
7  were ceded to them by the City of Los Angeles) are held in trust
8  by the United States for the Tribe.

9      Moreover, even a cursory examination of the Complaint
10  suggests that the City could not obtain complete relief in the
11  absence of the United States.  The key issue in the present
12  lawsuit is whether Congressional consent to the Exchange
13  Agreement was properly given.  Plaintiffs' theory of the case is
14  that "[b]ecause the conditions mandated by Congress in the Act
15  for conveyance of the Bishop Tribal Lands were not satisfied, the
16  purported transfer of those lands by the United States to the
17  City was null and void."  (Compl. at ¶23.)  Among other things,
18  Plaintiffs allege that (1) BIA agents conducted a grossly
19  insufficient canvass of the affected Indian population, a
20  requirement of the Act (*id.* at ¶10); and (2) that "[t]he
21  appraisals of the lands exchanged by the City and the United
22  States upon which the Exchange agreement was based did not
23  include the value of appurtenant water rights, making it
24  impossible to determine, as required by the Act, that the
25  properties conveyed to the City by the United States did not

26

27          [6]    As is discussed in greater detail below, the Puyallup
   court nevertheless determined that the case could proceed without
28  the United States under Rule 19(b).

**27**

1  exceed in value the properties received by the City" (*id*. at
2  ¶19).  The valuations made by the United States and is agents'
3  conduct put the government's performance in issue.

4      The United States is a "necessary" party for purposes of
5  Rule 19(a).

### b.   May the United States be Joined in this Action?

7      The next step is to determine whether the missing party can
8  be joined in the litigation.  Citing *Navajo Tribe*, 809 F.2d 1455,
9  City maintains that this case cannot proceed <u>with</u> the United
10 States as a party because any such claim is barred by the statute
11 of limitations set forth in the ICCA.[7]  Specifically, the City
12 asserts that the claims in this case are barred because they
13 accrued prior to August 13, 1946, but no claim was filed by the
14 Tribe with the Commission by the August 13, 1951 deadline.

15     The Tribe does not dispute that it failed to timely file a
16 claim under the ICCA.  It argues, however, that the ICCA only
17 bars untimely actions for <u>money damages</u> and does not bar suits in
18 which the remedy sought is possession of land.  Plaintiffs are
19 technically correct that the only available relief under the ICCA
20 is money damages.  But, as the *Navajo Tribe* court explained, this
21 was meant to be the <u>exclusive</u> remedy against the United States.

22          The Tribe, even if it had timely filed its claim under
23          the ICCA, could not have quieted title in these lands
            or maintained an action in ejectment... The Tribe
24          simply would have had to accept just monetary
            compensation if the Commission found their claim to

25

26     [7]   Act of Aug. 13, 1946, ch. 959, 60 Stat. 1049 (formerly
27 codified as amended at 25 U.S.C. §§ 70 to 70v-2 (1976), but
   omitted from current Code because the Indian Claims Commission
28 terminated on September 30, 1978).

title valid. This restriction as to remedy represents a fundamental policy choice made by Congress out of the sheer, pragmatic necessity that, although any and all accrued claims could be heard before the Commission, land title in 1946 could not be disturbed because of the sorry injustices suffered by native Americans in the eighteenth, nineteenth, and early twentieth centuries. Those injustices would have to be recompensed through monetary awards. As one commentator notes:

> The Indian Claims Commission Act also addressed a major collateral concern of the Congress. Prior to the Act, non-Indians who held title derived from federal patents to land claimed by Indians could not be secure in their ownership until the Indians' claims were litigated. By authorizing the Indian Claims Commission-the only forum in which Indian claims against the United States for land they once possessed could be heard-to grant only monetary damages in satisfaction of Indian claims, non-Indians were assured of continued possession regardless of the outcome of the litigation. Relief in the form of a declaratory judgment or injunction would have resulted in the radical remedy of dispossessing the dispossessors. By restricting the remedy, the Act forced the Indian to accept a post factum sale.

*Id.* at 1467.

The Tribes offer no authority suggesting that claims like those raised in this case are cognizable <u>against the United States</u> in district court.

### c. Can the Lawsuit Nevertheless Proceed Without the United States?

Because it appears that the United States cannot be joined in this action, by reason of the bar of the ICCA and its statute of limitations, the final question is whether the lawsuit can nevertheless proceed under Rule 19(b). The Supreme Court has adopted a four factor test based upon the factors listed in Rule 19(b), suggesting that a court should examine:

29

1      (1)    The plaintiff's interest in having a forum;

2      (2)    The defendant's interest in avoiding "multiple

3             litigation, [] inconsistent relief, or sole

4             responsibility for a liability he shares with

5             another;"

6      (3)    The interest of the "outsider whom it would have

7             been desirable to join," by examining "the extent

8             to which the judgment may 'as a practical matter

9             impair or impede his ability to protect' his

10            interest in the subject matter;" and

11     (4)    The interest of the courts and the public in

12            "complete, consistent, and efficient settlement of

13            controversies."

14  *See Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S.

15  102, 109-11 (1968).  *Provident Tradesmens* rejected the

16  application of a rigid, formalistic approach to rule 19(b),

17  instead requiring the district courts to undertake a "practical

18  examination of [the] circumstances" to determine whether the

19  action may "in equity and good conscience" proceed without the

20  absent party.  *See* 390 U.S. at 119-20 n.16.

21       The City argues that the case cannot proceed because:

22            Both equity and good conscience mandate that the
              federal government be a party to any proceeding which
23            could materially alter the nature and extent of trust
              holdings of the United States in the Owens Valley. This
24            is especially so since there is no allegation that Los
              Angeles has failed in any way to meet its obligations
25            under its agreements with the United States.  Indeed,
              the complaint is rife with allegations that federal
26            officers failed to perform their duties under the 1937
              Act: botched signature gathering, acceptance of
27            contractual water rights in lieu of appurtenant rights,
              etc. These are  allegations the United States cannot
28            answer and certainly allegations Los Angeles cannot

**30**

answer unless the federal government is made a party to these proceedings

(Doc. 67 at 8.)

The City again relies on to *Navajo Tribe*, in which the Navajo asserted that the United States improperly transferred tribal lands to the State of New Mexico and several individuals. The district court determined that the United States was a necessary party that could not be joined, concluding that "the action cannot proceed in equity and good conscience" without the presence of the United States.  809 F.2d at 1471.  On appeal, the Tenth Circuit affirmed this conclusion, adopting the trial court's reasoning that the claims were actually "challenges to the validity of the transactions by which the United States assumed title to the disputed land":

> The Tribe's claims against the remaining defendants are, in reality, challenges to the validity of the transactions by which the United States assumed title to the subject land. Specifically, the Tribe seeks to cancel and set aside all patents, grants, assignments, leases, and other conveyances made or done pursuant to § 25 of the Act of May 25, 1908, and any Executive Order promulgated thereunder.
>
> It is a fundamental principle of the law that an instrument may not be cancelled by a Court unless the parties to the instrument are before the Court." *Tewa Tesuque v. Morton*, 360 F. Supp. 452 (D.N.M.1973), aff'd, 498 F.2d 240 (10th Cir.1974). Moreover, "as a matter of federal law, it is well established that the validity of a deed or patent from the federal government may not be questioned in a suit brought by a third party against the grantee or patentee." *Raypath, Inc. v. City of Anchorage*, 544 F.2d 1019, 1021 (9th Cir.1977).
>
> In addition, a tribe may not avoid the exclusivity bar of § 70k of the Indian Claims Commission Act by seeking title, possession and damages from successors in interest of the United States, where suit against the federal government is barred. *Oglala II*...

809 F.2d at 1471-72 (emphasis added).  The Navajo argued that the

31

district court had failed to make a sufficiently particularized

inquiry into the Rule 19(b) factors.  The Tenth Circuit

disagreed, reasoning that the facts supported a finding of

indispensibility:

> ...[T]he trial court's opinion evince[s] sufficient
> facts and analysis to buttress its holding, including:
> (1) that the claims against the non-federal parties
> rested on documents of title or possession derived from
> the United States; (2) that the Tribe seeks to cancel
> all such instruments; (3) that this court has affirmed
> the principle that all parties to an instrument must be
> present, else it may not be cancelled; (4) that, more
> specifically, validity of a deed or patent issued by
> the Federal Government cannot be questioned in suit by
> a third party against the grantee; and (5) that the
> Eighth Circuit has found indispensability in analogous
> circumstances.

*Id.* at 1472.

The Tenth Circuit then applied the rule 19(b) factors.  Of

particular note was the Tenth Circuit's discussion of the extent

to which a judgment rendered in the United States' absence might

be prejudicial to it or other parties.  The court found that

"prejudice to the United States is clear" because a large portion

of the disputed reservation lands were still in possession of the

United States.  *Id.*  In addition "such prejudice could not be

lessened or avoided either through protective provisions in the

judgment or through the shaping of relief.  Title to the []

reservation must be decided entirely or not at all....[I]n light

of the large holdings of land claimed by the United States in

this case, a judgment rendered in its absence would not be

adequate."  *Id*.

With respect to the question of whether the Navajo would

have an adequate remedy if the action was dismissed for

nonjoinder, the Tenth Circuit "concede[d] that the Tribe has no

**32**

1   such remedy." *Id.*   Yet, the court held that "this lack does not

2   preclude a finding of indispensability in this case," in part

3   because equitable considerations counseled in favor of a finding

4   of indispensability. *Id.*   Specifically, the Tenth Circuit

5   reasoned:

6              <u>A finding here that the United States is not an
            indispensable party would allow a tribe to avoid the
7            admittedly catastrophic effects under the ICCA of
            sleeping on its pre-1946 claim by simply waiting until
8            the United States transfers title and then bringing
            suit against the successors in interest to the United
9            States-even though suit against the United States
            itself is barred</u>. That would undermine the very
10           intricate and exclusive remedial scheme that Congress
            created in the ICCA. As discussed earlier, one of the
11           very reasons the Commission was only empowered to award
            money damages was so that interests of innocent,
12           third-party grantees would not now be disturbed. We
            agree with the district court that "in equity and good
13           conscience," the action should not proceed.

14  *Id*. at 1073.

15       The instant case is similar to *Navajo Tribe* insofar as the

16  Tribe seeks title and possession of the land which the City holds

17  as a successor in interest to the United States.  In addition,

18  like in *Navajo Tribe*, the Tribe here alleges that the United

19  States acted unlawfully and that these unlawful acts precipitated

20  an unlawful transfer of Tribal lands to the City.

21       In certain other respects, *Navajo Tribe* is distinguishable.

22  First, in *Navajo Tribe,* "prejudice to the United States [was]

23  clear," in part because judgment as to the disputed parcels could

24  potentially impact the "large holdings of land" still in

25  possession of the United States.  In contrast, in the present

26  case, the only lands at issue are those that were the subject of

27  the Exchange Agreement, lands which are either now held by the

28  City or by the United states in trust for the Tribe.  No other

**33**

holdings of the United States are implicated.  In addition, in *Navajo Tribe* the Tenth Circuit found that the Navajo sought to evade "the effects under the ICCA of sleeping on its pre-1946 claim by simply waiting until the United States transfers title and then bringing suit against the successors in interest."  809 F.2d 1455.  Here, the same motives cannot be ascribed to the Tribe at this stage in the litigation.  Whether or not the tribes slept on their rights is a factual issue that cannot be determined on this record.[8]

The Tribe points to two Ninth Circuit cases which arguably contradict *Navajo Tribe*, *Fort Mojave Tribe v. Lafollete*, 478 F.2d 1016 (9th Cir. 1973) and *Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251 (9th Cir. 1983), both of which address the indispensable party issue.

*Fort Mojave* involved a suit by an Indian tribe to quiet title to certain claims made against tribal lands.  478 F.2d 1016.  The Ninth Circuit held that the United States was <u>not</u> an indispensable party:

---

[8]    The City also cites *Raypath Inc. v. City of Anchorage*, 544 F.2d 1019, 1021 (9th Cir. 1977), cited in *Navajo Tribe* for the proposition that the validity of a patent from the federal government may not be questioned in a suit brought by a third party against the patentee.  But, the Tribe correctly points out that *Raypath* held only that third parties have no private cause of action against a grantee because "they are complete strangers to the title and are not persons in whose favor any of the covenants, conditions, or restrictions in the deed were intended to run."  *Id*. at 1021.  Here, the Tribe is more than a third party to the Exchange Agreement; the Tribe was the intended beneficiary of the agreement entered into by the City and the United States acting on behalf of the Tribe.

1
2
3
4
5
6
7
8

> Without joining the United States, an Indian tribe may
> sue in its own right to protect its interest in
> restricted land.  As the United States will not be
> bound by any determination made in a suit to which it
> is not a party, "[i]t does not appear that failure to
> join the United States would radically and injuriously
> affect its interest nor will a final determination be
> inconsistent with equity and good conscience."
>
> ***
>
> Congress intended by § 1362 to authorize an Indian
> tribe to bring suit in federal court to protect its
> federally derived property rights in those situations
> where the United States declines to act.

9   *Id*. at 1017-18.

10       The holding from *Fort Mojave* was reiterated in *Puyallup*.  As

11   previously discussed, *Puyallup* was a suit brought by an Indian

12   tribe to quiet title to a portion of riverbed exposed by a

13   dredging and rechannelization project.  717 F.2d 1251.  The

14   *Puyallup* court held that "the rule is clear in this Circuit and

15   elsewhere that, in a suit by an Indian tribe to protect its

16   interest in tribal lands,...the United States is not an

17   indispensable party in whose absence litigation cannot proceed

18   under Rule 19(b)."  *Id*. at 1254 (emphasis in original).

19       The Tenth Circuit in *Navajo Tribe* distinguished the holding

20   in *Puyallup* and several related cases on the ground that, in

21   those cases, the tribe was not adverse to the United States:

22
23
24
25
26
27

> In *Choctaw, Puyallup, and Narragansett*, the interest of
> the United States was aligned with that of the Indians.
> The Government was the putative fee owner of the trust
> lands in which the Indians asserted beneficial
> ownership in a suit strictly against third parties.
> As the putative fee owner, the Government certainly had
> an interest in the litigation but, understandably, was
> not found indispensable when the third parties sought
> dismissal for nonjoinder.  In *Andrus*, the interests of
> the United States and the Indians were also mutual.

28

1
2
3
4

> The posture of this case is quite different. <u>The Tribe and the United States are adversaries, each claiming sole title to the same land.</u> Unlike in the above cases, the United States and the Tribe are not aligned together against the countervailing interests of third parties. We do not, therefore, find the above authorities persuasive in the present case.

5   809 F.2d at 1473.

6       One district court that struggled mightily with all of these

7   authorities drew a similar distinction between cases in which

8   "the central issue is the legality of the United States' actions

9   in facilitating the alienation of Indian land" and those cases in

10  which the United States is not implicated in unlawful acts. *See*

11  *Red Lake Band of Chippewas v. City of Baudette, Minnesota*, 730 F.

12  Supp. 972 (D. Minn. 1998). On the one hand, the *Red Lake Band*

13  court identified a line of cases in which the lawfulness of the

14  United States' actions was the central issue. *E.g., Navajo*, 717

15  F.2d 1251; *Nichols v. Rysavy*, 809 F.2d 1317 (8th Cir.

16  1987)(United States an indispensable party where claim was that

17  United States wrongfully issued fee patents); *Oglala Sioux Tribe*

18  *v. United States*, 650 F.2d 140 (8th Cir.1981)(dismissing case for

19  failure to join the United States, where allegation was that the

20  government unconstitutionally exercised its power of eminent

21  domain when it took an area of land from the tribe); *Manypenny v.*

22  *United States*, 125 F.R.D. 497 (D. Minn. 1989)(United States an

23  indispensable party where plaintiffs alleged that its title to

24  land was clouded by the federal government's issuance of fee

25  patents to allottees in violation of federal statute). With

26  respect to these cases, the United States was deemed

27  indispensable because "the plaintiffs' claim was ultimately a

28  dispute about the legality of actions taken by the United

1   States." *Red Lake Band*, 730 F. Supp. at 978.

2       The *Red Lake Band* court then identified a distinct line of

3   cases in which no such wrong was alleged. *E.g., Bird Bear v.*

4   *McLean County*, 513 F.2d 190 (8th Cir. 1975); *Choctaw and*

5   *Chickasaw Nations v. Seitz*, 193 F.2d 456 (10th Cir. 1951); *Fort*

6   *Mojave,* 478 F.2d 1016.   In *Bird Bear*, plaintiffs sought

7   compensation for a road easement granted to defendant prior to

8   allotment of the land to a tribe and prior to incorporation of

9   the allotment into the tribe's reservation.   The Eighth Circuit

10  in *Bird Bear* found that United States was not an indispensable

11  party under the facts and circumstances.   513 F.2d at 191 n.6.

12  The *Bird Bear* court also noted that it had invited the Department

13  of Justice to submit a brief as amicus curiae, but that

14  invitation was declined.   *Id.*

15      Similarly, in C*hoctaw*, 193 F.2d 456, tribal plaintiffs sued

16  several private individuals who claimed an interest in land

17  alleged to be "part of an unallotted common domain" of the

18  Choctaw and Chickasaw Nations.   The Tenth Circuit reversed the

19  district court's dismissal of the case for failure to join the

20  United States as an indispensable party, reasoning:

21          Since, unless the United States becomes a party to the
            action it will not be bound by any judgment entered
22          therein, a judgment entered as between the Nations and
            the defendants below would not radically and
23          injuriously affect the interest of the United States.
            The question then narrows to whether a judgment could
24          be entered as between the Nations and the defendants
            below which would be consistent with equity and good
25          conscience.

26  193 F.2d at 458.   The Tenth Circuit concluded that the balance of

27  the equities weighed in favor of allowing the parties' claims to

28  title to be adjudicated.   193 F.2d at 460-61.

1    The district court in *Red Lake Band* chose to follow the
2 latter line of cases, because the Red Lake Band had not
3 "challenge[d] the legality of the federal government's acts."
4 *Id*. Rather, the Red Lake Band sought a determination of whether
5 an interest granted to a third party by the United States was or
6 was not an easement.

7    Here, in contrast, the Tribe <u>is</u> alleging that officers of
8 the United States committed various wrongs, including failure to
9 comply with the requirement that the Department of Interior
10 obtain consent of the majority of adult members of the Tribe and
11 of failing to obtain lands of equivalent value in the exchange.
12 In this respect, the instant case resembles *Navajo*, *Nichols*,
13 *Oglala*, and *Manypenny*.[9]

14    Plaintiffs cite additional authority that distinguishes
15 *Navajo Tribe* on alternative grounds.  First, the Tribe cites
16 *Sokaogon Chippewa Community v. Oneida County, Wisconsin*, 879 F.2d
17 300 (7th Cir. 1989), in which the Sokaugon sued the United
18 States, the State of Wisconsin, and several private defendants to
19 quiet title ceded by the Sokaogon to the United States pursuant
20 to a treaty.  The Tribe asserted that its right to occupy the
21 land was never terminated by the treaty, because the United
22 States reneged on various promises made in the treaty.  *Id*. at

23

24    [9]    The Navajo court also expressed concern that a judgment
25 absent the United States might have an impact on "innocent third
party grantees." 809 F.2d 1473.  However, as the Tribe points
26 out, assuming the truth of the Tribe's allegations as a court
must on a motion to dismiss, "the City of Los Angeles actively
27 and admittedly chose to embark on a course of action it knew was
contrary to its own city charter and statutory requirements
28 imposed by Congress."  (Doc. 62 at 24.)

**38**

301-02.  The *Sokaogon* court found that the United States could

not be a party to the case because the ICCA's statute of

limitations had run.  However, the court declined to find that

the United States was an indispensable party.  Evaluating the

Rule 19(b) factors, the *Sokaogon* court reasoned that the

defendants (who were then in possession of the disputed property

rights) would not be at risk of multiple liability and might have

a claim against the United States for breach of a warranty of

good title.

> The plaintiff has no other route for establishing its
> rights in the tract. The defendants are not at risk of
> multiple liability; on the contrary, if they lose this
> suit and are forced to give back their mineral and
> other land rights to the tribe, they may have a claim
> [] against the U.S. for breach of a warranty of good
> title. (We do not say they do; we express no view on
> the question; we do not even know whether the U.S. was
> their immediate grantor.)

*Id*. at 304 (emphasis added).  The court also noted that the

United States had declined to take any position on its

indispensability, and that the public interest favors where

possible the resolution of legal questions on the merits.  *Id*. at

304-05.

> If the Sokaogon have a good claim to this land, they
> ought not be barred from prosecuting it by their
> inability to sue an entity perhaps only remotely
> involved in their dispute with [defendants]. To
> exaggerate slightly (because the U.S. appears to be in
> occupation of some of the land, although the extent of
> that occupation is entirely unclear on the skimpy
> record of this case), it is as if every time someone
> claimed that someone else was encroaching on his
> property he would have to sue not only the alleged
> encroacher (here Exxon) but also the alleged
> encroacher's predecessors in title right back to King
> James or Lord Baltimore (here the U.S.). So far as can
> be determined from an utterly inadequate record, the
> relationship of the U.S. to the Indians' controversy
> with Exxon and the other occupiers of the land in
> derogation of the Indians' alleged occupancy rights is
> that of a predecessor in title (to Exxon), no more.

**39**

*Id.* at 304-05 (emphasis added).   The *Sokaogon* court then distinguished *Navajo Tribe* and several other related cases

> In two of the cases the U.S. was clearly exposed to potential liability to its grantee; in the third [*Navajo Tribe*], property rights claimed by the U.S. were in jeopardy....In none of the cases is there any indication that the U.S. had disclaimed indispensability.

*Id.* at 305.

Similarly, in *Picuris Pueblo v. Oglebay Norton Co.*, 228 F.R.D. 665 (D.N.M. 2005), the *Picuris* tribe claimed to hold aboriginal title to lands being mined by defendants.   The *Picuris* sought to eject the defendant mining companies from its lands. One defendant argued that *Navajo Tribe* mandated dismissal because the United States was an indispensable party.   The *Picuris* court disagreed, reasoning that:

> In *Navajo Tribe,* the Tribe sought a declaratory judgment that the Tribe had equitable title to unallotted lands that were added to the reservation by executive order and that the United States breached its fiduciary duty to the Tribe by restoring such lands to the public domain. On this basis, the Tribe attacked the validity of all subsequent instruments issued by the United States.
>
> ...In *Navajo Tribe*, <u>the claims were essentially a dispute about the legality of executive orders issued by the United States</u>. The Tribe traced its claim to the land to government action in the form of executive order. That is a crucial difference between Navajo Tribe and the instant case. <u>In this action, Picurís claims aboriginal title to the land; it does not rely on any action of the United States to support its claim to the land</u>. Picurís does not challenge the validity of the patent issued by the United States; it claims that the patent was issued subject to its rights. Thus, Navajo Tribe is inapplicable and not binding herein.
>
> ***

> The fact that the United States issued the patent to [Defendant's] predecessor in interest is insufficient to transform the United States into an indispensable party. The alleged interests of the United States identified by [Defendant] are not the type of concrete, practical interests that require dismissal.

228 F.R.D. at 667.

Both *Sokaogon* and *Picurus* are distinguishable from the instant case.  The *Sokaogon* court emphasized that the Sokaogon should not be barred from prosecuting their claim because the United States is "remotely involved in their dispute."  In a similar vein, the *Picuris* court emphasized that the Picuris Pueblo did "not rely on any action of the United States to support its claim to the land."  Here, by contrast, tribe does rely on actions (or lack thereof) of the United States to support their claim and the United States is more than remotely involved in this dispute.

All of these cases reinforce the fact-specific nature of the inquiry under Rule 19(b).  It is appropriate then to return to the four factor test set forth in *Provident Tradesmens*, which requires inquiry into

> (1)   The plaintiff's interest in having a forum.
>
> (2)   The defendant's interest in avoiding "multiple litigation,...inconsistent relief, or sole responsibility for a liability he shares with another."
>
> (3)   The interest of the "outsider whom it would have been desirable to join," by examining "the extent to which the judgment may 'as a practical matter impair or impede his ability to protect' his interest in the subject matter."

**41**

(4)   The interest of the courts and the public in
"complete, consistent, and efficient settlement of
controversies."

*Provident Tradesmens*, 390 U.S. at 109-11.

Plaintiff's interest in having a forum is strong.  As in *Sokaogon*, 879 F.2d at 304, "plaintiff has no other route for establishing its rights in the tract."[10]  Also like in *Sokaogon*, no party has explained how a judgment in this case will expose the United States to "liability or other burdens as a consequence of a judgment in favor of the plaintiffs."  *Id*. at 305.  Finally, the interest of the courts and the public in "complete, consistent, and efficient settlement of controversies" favors allowing this claim to proceed.

However, as the City points out, "the complaint is rife with allegations that federal officers failed to perform their duties under the 1937 Act: botched signature gathering, acceptance of contractual water rights in lieu of appurtenant rights, [failed to obtain land of the same value,] etc.  These are allegations...Los Angeles cannot answer unless the federal government is made a party to these proceedings."

This case presents a unique set of circumstances for which there is no exact parallel in any case cited by the parties.  In

---

[10]   Navajo Tribe dismissed the import of this factor, reasoning, essentially, that the ICC provided the "exclusive forum to litigate [any] pre-1946 civil claim against the United States."  809 F.2d at 1476 n29.  But, this begs the question of whether the United States is itself an indispensable party.  Only after the Navajo Tribe court concluded that the United States was indispensable did the Navajo Tribe justify depriving the Navajo of a forum to sue any other parties.

**42**

1  the final analysis, it cannot be ignored that the Tribe's claims

2  are grounded in large part upon allegations of wrongdoing by

3  agents of the federal government.  The Tribe alleges that agents

4  of the BIA committed fraud when they purported to obtain the

5  consent of members by acquiring signatures on blank pieces of

6  paper.  These allegations cannot be easily separated from the

7  other allegations in the case, which largely raise related

8  questions of law.  For example, the Tribe alleges that the

9  Exchange Agreement's failure to require the transfer of

10 appurtenant (*Winters*) rights violates the 1937 Act and therefore

11 renders the exchange unlawful.  This challenge indirectly

12 questions whether the United States fulfilled its obligation to

13 obtain land of equivalent value.

14     The distinction drawn in *Red Lake Band* between (a) those

15 cases in which "the central issue is the legality of the United

16 States' actions in facilitating the alienation of Indian land,"

17 and (b) those cases in which no such wrong was alleged is

18 instructive.  730 F. Supp. at 9787-78.  For the former, the

19 united states is indispensable; for the latter, it is not.  Here,

20 the face of the complaint focuses upon the alleged wrongdoing of

21 the United States.  Although no immediate property interests of

22 the United States (other than those held in trust for the Tribe)

23 appear to be implicated in this case and the United States has

24 expressed no opinion as to its indispensability, it is difficult

25 to see how the case could proceed without the full participation

26 of the United States in the lawsuit, given that agents of the

27 United States are accused of various omissions and wrongdoings.

28

**43**

Although this is an exceedingly close case, the United States is indispensable to this litigation, which cannot proceed in its absence.  The complaint must therefore be **DISMISSED WITH LEAVE TO AMEND.**

### d.   Miscellaneous Arguments.

Both parties focus on the following passage from *Navajo Tribe* contained within the Tenth Circuit's discussion of indispensability:

> [A] tribe may not avoid the exclusivity bar of § 70k of the Indian Claims Commission Act by seeking title, possession and damages from successors in interest of the United States, where suit against the federal government is barred. *Oglala II*...

The City maintains that this passage bars this suit in its entirety.  The Tribe disagrees, citing several cases, including one, *Swim v. Bergland*, 696 F.2d 712 (1983), in which a claim for use of land was permitted to proceed against the United States.  None of the cases cited by the Tribe are controlling.  *Swim* concerned an 1898 Treaty that contained a reservation of tribal grazing rights.[11]  In 1978, the Indian tribes that were parties to the 1898 Treaty signed a memorandum of understanding concerning grazing rights under the Treaty, which provided that

---

[11]   The Treaty in *Swim* provided:

So long as any of the lands ceded, granted, and relinquished under this treaty remain part of the public domain, Indians belonging to the above-mentioned [Shoshone-Bannock] tribes, and living on the reduced [Fort Hall] reservation, shall have the right, without any charge therefor, to cut timber for their own use, but not for sale, and to pasture their livestock on said public lands, and to hunt thereon and to fish in the streams thereof.

1  the "[t]ribes may graze a maximum of 826 head of cattle annually
2  within the ceded areas of the Caribou Forest and that the Forest
3  Service may issue annual permits to non-Indians for any grazing
4  capacity not used by the Tribes."  Later that same year,
5  non-Indian grazing permit holders initiated a declaratory
6  judgment action against the Secretary of Agriculture, seeking to
7  enjoin implementation of the Memorandum of Understanding and any
8  resulting reduction in their permitted grazing capacity.  The
9  tribes intervened.

10       The non-Indian plaintiffs in *Swim* argued first that the
11 tribal grazing rights had been extinguished by a prior settlement
12 under the ICCA.  The Ninth Circuit rejected plaintiffs' argument
13 that the prior settlement was a bar to a subsequent suit,
14 reasoning:

15           In 1967 the Tribes reached a stipulated settlement with
            the United States for additional compensation for the
16          occupancy rights ceded by the Article I of the 1898
            Agreement. The non-Indian permittees assert that the
17          language of this settlement encompasses all claims in
            regard to Article IV use rights as well. We reject this
18          assertion. There is no evidence in the record that
            either party to the settlement believed that Article IV
19          [tribal grazing] rights were involved in the 1967
            settlement....
20
            The non-Indian permittees rely solely on general
21          language of the settlement documents to sweep in
            Article IV grazing rights, even though all specific
22          language in the pertinent documents, including the
            original petition, refers only to the low compensation
23          paid for lands ceded in Article I. The Tribes' petition
            before the Indian Claims Commission did not plead any
24          extinguished grazing rights. The stipulated settlement
            which reached all claims before the Commission did not
25          encompass tribal grazing rights.

26 *Id*. at 718.

27      The non-Indian plaintiffs also argued that the claim should
28 be barred on equitable grounds because the government's

**45**

1   restriction of tribal grazing rights began in 1907, more than

2   sixty years before they filed suit.  *See Id.* at 718.   The *Swim*

3   court also rejected this argument:

> The failure of the Tribes to exercise their grazing
> rights from 1907, when local Forest Service officials
> ousted them, to 1978 has no effect on the vitality of
> their Article IV rights. Laches or estoppel is not
> available to defeat Indian treaty rights. *Board of
> Commissioners v. United States*, 308 U.S. 343, 351
> (1939); *United States v. Ahtanum Irrigation District*,
> 236 F.2d 321, 334 (9th Cir. 1956). This is true even
> where the Indians have long acquiesced in use by others
> of affected lands or have purported to grant away their
> occupancy and use rights without federal authorization.
> *United States v. Southern Pacific Transportation Co.*,
> 543 F.2d 676, 699 (9th Cir. 1976).

11  *Id.* (citations edited).

12      The Tribe cites *Swim* in support of a convoluted argument

13  that the instant claim is not barred by the ICCA because it is

14  not governed by the ICCA.  Specifically, the Tribe argues:

> If the reasoning in Navajo Tribe controlled, it should
> not have mattered whether the tribe settled the claims
> against the United States or not.  The claims clearly
> accrued in 1907 with the Forest Service's first
> interference with the tribe's grazing, and thus could
> have been brought under the ICCA.  If they were not,
> under Navajo Tribe they would be time barred and could
> not be asserted in any event.  The fact that the Ninth
> Circuit thought that whether the rights were settled
> made a difference indicates it does not share the Tenth
> Circuit's view of the effect of the ICCA on unlitigated
> "live" title claims.

(Doc. 62 at 22. (emphasis added).)  But, the Tribe reaches an

unwarranted conclusion.  *Swim* does not clearly conclude that the

claims in that case accrued in 1907.  Rather, *Swim* applied the

then-applicable rule that neither Laches nor estoppel are

available to defeat Indian treaty rights, a rule that has since

been rejected by the Supreme Court in *Sherrill*.  The Tribe's

convoluted logic fails at the first step.  *Swim* sheds no

**46**

additional light on the question of whether the ICCA bars the

filing of an action against the United States in this case.

Similarly, the Tribe cites *Oregon Department of Fish and

Wildlife v. Klamath Indian Tribe*, 473 U.S. 753 (1985), in which

the Klamath Tribe sought to enjoin enforcement of state hunting

and fishing regulations on certain aboriginal lands that had been

ceded to the United States in a 1901 agreement.  The Supreme

Court held that because the agreement did not specifically

mention the retention of subsistence hunting and fishing rights,

the rights were extinguished by the agreement.  The Klamath Tribe

maintained that they did not intend to extinguish these rights,

arguing that "the absence of any payment expressly in

compensation for hunting and fishing rights on the ceded lands

demonstrates that the parties did not intend to extinguish such

rights with the 1901 agreement."  *Id*. at 754.  The Supreme Court

rejected this argument on several grounds, noting that the

Klamath Tribe "has since been afforded an opportunity to recover

additional compensation for the ceded lands" through the ICC

process.  *Id*. at 774.  The Court also noted that the fact that

the ICC's findings of fact referenced the "subsistence" value of

nonlumbering and nongrazing areas within the ceded lands,

"further undercut[]" the Klamath Tribe's reliance on an alleged

failure of compensation for hunting and fishing rights.  *Id*. at

774 n.24.

The Tribe argues, again, that, "if the reasoning of *Navajo

Tribe* had been applied by the Supreme Court [in *Oregon Department

of Fish and Wildlife*,] the rights could not have been asserted

regardless of whether the tribe had received compensation for

**47**

them." (Doc. 62 at 22-23.)  But, the Tribe again assumes too
much.  The *Oregon* court did not discuss whether the United States
was an indispensable party.

Nevertheless, giving literal effect to the language from
*Navajo Tribe* -- by barring any claim against successors in
interest to the United States where a suit against the United
States would be barred –- would eviscerate the operation of
Federal Rule of Civil Procedure 19(b).  In fact, subsequent Tenth
Circuit cases, including *Sokaogon*, 879 F.2d 300, faithfully
applied the balancing process of Rule 19(b), rather than the
bright-line bar suggested in *Navajo Tribe*.  *Navajo Tribe* is just
an example of a case in which a court found that the balance
tipped in favor of dismissal.  The same finding is appropriate
here.

## V.   CONCLUSION

For the reasons set forth above, the City's motion to
dismiss under Rule 19 is **GRANTED**.  Any amended complaint shall be
filed within thirty days following the filing of this decision.


IT IS SO ORDERED.

**Dated:   February 14, 2007**              _____/s/ Oliver W. Wanger_____
b2e55c                                      UNITED STATES DISTRICT JUDGE

**48**